**John R. GRAZIANO, Plaintiff,**

v.

**NEW YORK STATE POLICE, Defendant.**

**No. 00 CIV. 4392(WCC).**

United States District Court, S.D. New York.

April 26, 2002.

Law Offices of Michael H. Sussman, Attorneys for Plaintiff, Goshen, Michael H. Sussman, Esq., Of Counsels.

Eliot Spitzer, Attorney General of the State of New York, Attorneys for Defendant, New York, Lee Alan Adlerstein, William B. Jaffe, Asst. Attorneys General, Of Counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff John R. Graziano, a Caucasian male, brings the instant action against the New York State Police ("NYSP") pursuant to Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII"). Plaintiff claims that he suffered discrimination and harassment on account of his gender which created a hostile work environment and culminated in his constructive discharge. Defendant now moves for summary judgment pursuant to FED. R. CIV. P. 56. For the reasons that follow, defendant's motion is granted.

### BACKGROUND [1]

Plaintiff worked for the NYSP as a forensic scientist at the Stewart Airport Crime Lab in Orange County (the "Lab") from August 23, 1984 until January 13, 2000. (Complt.¶¶ 5–6.) The duties of his employment included screening evidence submitted by law enforcement agencies for the presence and absence of controlled substances, presenting his findings before grand juries and at trials and maintaining the instruments at the Lab. (*Id.* ¶¶ 7, 10(b)). In October 1992, a female co-worker, Patricia Kantha, filed a sexual harassment complaint (the "Kantha complaint") against plaintiff. After an investigation, the NYSP issued a letter to plaintiff on July 22, 1993 stating that Kantha's allegations could not be substantiated and that no further action would be taken. (Graziano Aff. ¶ 4; Pl.Ex. 17.) Kantha also pur-

---

[1]. The following facts are gleaned from the Complaint and the papers submitted both in support of and in opposition to the instant motion for summary judgment. All inferences are drawn in favor of plaintiff, the nonmovant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

sued her sexual harassment claim with the New York State Division of Human Rights ("NYSDHR"). Although NYSDHR found probable cause that plaintiff had committed sexual harassment against Kantha, the matter never proceeded to trial. (*Id.* ¶ 5.)

Plaintiff alleges that his female co-workers subjected him to ongoing harassment and discrimination following the Kantha complaint. (*Id.* ¶ 6.) In particular, plaintiff claims that Kantha, in concert with Gail Tissot, and later Tissot, Joanne Bierschenk and Debbie Beach, directed continuous hostility towards plaintiff that was not addressed by the NYSP. (Pl. Mem. Opp. Summ. J. at 10.) The specific incidents of alleged harassment are set forth below.

In 1992, the NYSP instituted a peer review process in the Lab whereby employees would review and sign off on each other's cases. Plaintiff claims that Tissot, Bierschenk and Beach used the peer review process to hold up his work—accusing him of failing to do sufficient tests although his work complied with NYSP protocol. (*Id.* at 11.) When Beach, a less experienced forensic scientist, was assigned to review plaintiff's cases in 1999, plaintiff complained to Lab Director Richard P. Nuzzo that Beach was frustrating his efforts to complete his work. Nuzzo allegedly told plaintiff to "like it or go find another job." (Graziano Aff. ¶ 7(mm).) Around the same time, plaintiff also complained to Nuzzo that his female co-workers refused to provide him with their cases for review and that he felt excluded from the review process.[2] (Pl. Mem. Opp. Summ. J. at 12.) Although Nuzzo sent plaintiff a memorandum on August 10, 1999 stating that he had been assured that cases would be more evenly distributed in the future, plaintiff maintains that the practice of exclusion continued. (Graziano Aff. ¶ 7(pp), Ex. 46.)[3]

At a drug section meeting held in Albany in July 1999, NYSP official Keith Coonrod, assigned a mass spectrometry task to Ann Marie John, a junior female employee, although plaintiff was in charge of gas chromatography/mass spectrometry at the Lab. Plaintiff was also excluded from other special assignments at this meeting. (Pl. Mem. Opp. Summ. J. at 3.) Plaintiff claims that being passed over at the meeting caused him further humiliation and "emboldened the women who had been isolating and scorning me." (Graziano Aff. ¶ 7(jj).)

For many years, plaintiff had been in charge of maintaining the Lab's instruments. (Pl. Mem. Opp. Summ J. at 4.) On Friday September 15, 1999, at Nuzzo's request, plaintiff relocated an old gas chromatography unit in order to accommodate new equipment. (*Id.* at 13.) The following Monday, Tissot and Beach allegedly began to berate plaintiff, claiming that he had wrongfully moved the machine. (*Id.* at 4; Graziano Aff. ¶ 7(yy).)

On September 28, 1999, Beach and Charlie Pompa approached plaintiff at his desk concerning his responsibility to repair a mass spectrometer that had been damaged in a severe storm. (Graziano Aff. ¶ 7(aaa).) According to plaintiff, Beach was upset that the machine was not yet repaired and pressured plaintiff to get it repaired immediately. (*Id.*) When plaintiff

---

**2.** Despite this allegation, plaintiff admits that in 1999 he requested that Joanne Bierschenk and he not review each other's work. (Graziano Dep. at 245; Graziano Aff., Ex. 46.)

**3.** Nuzzo's memorandum to plaintiff explains that the individuals who were reviewing plaintiff's work believed that his reaction to casework suggestions was unreasonable. As a result, co-workers had become less willing to review cases with him. (Graziano Aff., Ex. 46.)

requested that he be given a few minutes to get settled, Pompa and Beach continued to press him. (*Id.*) Beach made a comment suggesting that the machine would have been repaired had plaintiff not taken a "four-hour lunch." (*Id.*) Bierschenk joined Beach in berating plaintiff, who responded that they could maintain the machines themselves if they didn't like the way he was doing it. (*Id.*) Plaintiff then left the Lab to use the men's room at the adjoining NYSP barracks. As he walked back from the barracks, he heard Beach's husband yell after him that he had "no balls." (*Id.*) Following this incident, plaintiff spoke to Nuzzo and asked him to take some action against the three women who had been harassing him. Nuzzo suggested that plaintiff "put a slip in" and leave for the day. (*Id.*) Plaintiff perceived Nuzzo's reaction as an indication that he was siding with Beach and believed that plaintiff was the cause of the problems.[4] (*Id.*) A few days after this incident, Captain Hughes was assigned by Staff Inspector Gregory Sittler to investigate plaintiff. (*Id.* ¶ 7(fff).) Hughes issued a report on plaintiff to Deputy Superintendent Kenneth Cook on October 7, 1999. This report concluded that "a long standing problem exists involving Graziano and his work relationships with other employees. This condition has caused a disruption in the lab operations and has exacerbated the existing problems with a shortage of staff and a backlog of evidence analysis." The report also stated that plaintiff had been described by his co-workers as " 'paranoid,' 'emotionally unstable' . . ." and charged him with directing his tirades at women who were smaller in stature. According to

the report, co-workers expressed their fear that plaintiff would cause them physical harm. (Graziano Aff., Ex. 56.) From the information he had obtained from his investigation, Hughes concluded that "there is sufficient probable cause to believe that [plaintiff's] continued presence at work job (*sic*) represents a potential danger to persons or property and that it would severely interfere with operations at the lab." (*Id.*) On the same day Hughes issued his report, plaintiff was placed on involuntary leave for the purpose of obtaining psychiatric evaluation. (Pl. Mem. Opp. Summ. J. at 5.)

Although plaintiff was cleared by an evaluating psychiatrist as mentally capable of returning to work in late October 1999 (Def. Reply Mem. Supp. Summ. J., Ex. A), he remained on involuntary leave and was sent to a second psychiatrist for evaluation on December 28, 1999. (*Id.*, Ex. B.) After the second psychiatrist concluded that his return to work was appropriate, and Employee Health Services cleared his return, plaintiff was directed to report back to work on January 13, 2000. (Pl. Mem. Opp. Summ. J. at 6.) Two days before plaintiff's scheduled return, Nuzzo forwarded a memorandum written by Beach, Tissot, Bierschenk and John to human resources administrators, formally protesting plaintiff's reinstatement. In the memo, these women expressed their fear that plaintiff would continue his pattern of harassment and intimidation and perhaps become physically violent. They implored the administration to take measures to protect them from plaintiff's behavior. The memo also noted that there had been no incidents of personnel conflicts during the three

---

4. Following this incident, Nuzzo filed a report with the staff inspector stating that it was alleged that "Mr. Graziano engaged in misconduct in the workplace by yelling and screaming at co-workers to the extent of causing a major disruption in the workday of several analysts and creating a hostile work environment a the Mid–Hudson Lab." No mention is made in this report of the actions of the other co-workers. (Graziano Aff., Ex. 54.)

months of plaintiff's absence. (Graziano Aff., Ex. 82.)

Plaintiff returned to work as scheduled on January 13, 2000, and was directed to his desk by Nuzzo. He noticed that his female co-workers were not present, and alleges that he later learned that they had boycotted work and informed supervisory staff that they would not return to work if plaintiff was reinstated.[5] (Pl. Mem. Opp. Summ. J. at 6.) After less than an hour had passed, Nuzzo sat plaintiff in a room with Hector Jimenez from Human Resources and a new deputy who began work that day. (*Id.*) Nuzzo handed plaintiff a reprimand concerning the events of September 28, 1999 and began to read the charges out loud.[6] Plaintiff allegedly asked for an attorney and union representation, but Nuzzo yelled back that he needed neither. (*Id.* at 7.) After Nuzzo finished reading the reprimand, he informed plaintiff that he had received an unsatisfactory job performance evaluation. (*Id.*) At that, plaintiff announced that he had enough, and walked out of the meeting. When he returned to his desk, plaintiff informed Jimenez that he planned to retire because he did not believe that anything was going to be fixed at the Lab. (Graziano Dep. at 98.) He then typed out a two-line letter of resignation. (Graziano Aff., Ex. 84.)

Plaintiff claims that the foregoing actions taken against him by his female co-workers were done on account of his gender and created a hostile work environment leading to his constructive discharge in violation of Title VII. Defendant responds that summary judgment in this matter is appropriate because: 1) plaintiff cannot demonstrate that he was constructively discharged; 2) plaintiff cannot demonstrate that reactions of female co-workers to his conduct were motivated by animus toward plaintiff's gender rather than plaintiff's personality; and 3) the actions of female co-workers cannot be imputed to defendant. (Def. Mem. Supp. Summ. J. at 3.)

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 254 (E.D.N.Y. 1999). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson,* 477 U.S.

---

**5.** Contrary to this assertion, plaintiff himself has submitted a letter from Nuzzo, to which the aforementioned memo was attached, stating that Beach planned to be out of the office on January 13 for a subpoena and that Tissot planned to meet with her attorney on that day to explore her rights against plaintiff. Nowhere in the memo is it suggested that plaintiff's female co-workers refused to return to work if plaintiff was reinstated. (Graziano Aff., Ex. 82.)

**6.** The "Letter of Reprimand" stated that plaintiff had violated sections of the New York State Police Civilian Employee Manual ("NYSPCEM"). Specifically, the letter explained that plaintiff "upon being told that a laboratory instrument was malfunctioning, became irate and proceeded to yell at, deride, and use profanities, thus becoming verbally abusive, towards his co-workers. This conduct severely disrupted laboratory operations." (Graziano Aff., Ex. 85.)

at 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali,* 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court should resolve all ambiguities and draw all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir.1991).

## II. *Title VII Sexual Discrimination*

Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). In order to state a prima facie case for discrimination under Title VII, plaintiff must prove that: (1) he was a member of a protected class; (2) he was performing his duties satisfactorily; and (3) the circumstances give rise to an inference of discrimination on the basis of his membership in that class. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[7] It is now beyond doubt that Title VII's prohibition of discrimination on the basis of sex protects men as well as women. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Plaintiff's gender discrimination claim under Title VII is based on both hostile work environment and constructive discharge theories. However, both of these claims ultimately fail because plaintiff has failed to allege facts giving rise to an inference that he was discriminated against on the basis of gender.

### A. *Hostile Work Environment*

In order to succeed on a hostile work environment claim, the plaintiff must show that the workplace was so ridden "with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Plaintiff must also show that there is a specific basis for imputing the conduct to the employer. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). The hostility of the work environment is determined by considering the totality of the circumstances. *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Considering the examples cited by plaintiff, it is doubtful that these incidents, essentially amounting to disagreements and arguments with co-workers, could support a hostile work environment claim. More importantly however, the record is utterly void of facts to support the contention that this conduct was motivated by animus directed towards plaintiff's gender.

Turning to the specific incidents cited by plaintiff, much is made of plaintiff's alleged exclusion from the peer review process and a supposed conspiracy to thwart his productivity. However, as plaintiff's own testimony reveals, disputes with his co-workers over the peer review process essentially stemmed from disagreements over procedure rather than an effort to exclude plaintiff because of his gender. As plaintiff explains, he endorsed a shorter

---

**7.** Although this is not an exact statement of the test articulated in the *McDonnell Douglas* case, the Supreme Court explained that "the prima facie proof required ... is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. 1817.

drug screening test than his co-workers. (Graziano Dep. at 40.) The shorter test had been researched and agreed upon at NYSP headquarters in Albany. However, plaintiffs' co-workers, Tissot in particular, did not believe that the shorter test was acceptable. (*Id.* at 41.)

> Q: And you're saying that there was a *philosophical difference* between you and Gail Tissot relating to whether or not the short run was appropriate?
>
> A: I guess you could say that, yeah.
>
> Q: Was Gail Tissot taking the position that the short run should never be employed?
>
> A: Yeah, that's right.
>
>       \*     \*     \*     \*     \*     \*
>
> A: It was just her own personal stand. I don't think she even had a basis for it. She liked to assert herself.

(*Id.* (emphasis added).) Nowhere in this exchange is it even suggested that Tissot's conflict with plaintiff over the peer review process resulted from gender bias rather than a genuine disagreement over lab procedure. Furthermore, it is apparent from plaintiff's own statements that his co-workers' hesitancy to exchange their cases with him also arose from differences in opinion over the review process. Plaintiff admits that he did not engage in exacting reviews of his peers' work and resented when his peers subjected his own work to scrutiny: "[M]y nature in this was that everybody there knew how to identify substances ... as long as in my mind I knew that they were from a moral standpoint ... then I would just sign off on them, that I believed in this person and their work.... There were other people that are more, you

know, control freak people, people that want to mandate every little thing that you do or force their opinion and that was one of the difficulties with the peer review process." (*Id.* at 119.) Moreover, plaintiff concedes that he specifically asked that he and another co-worker not review each other's work. (*Id.* at 245.) Although plaintiff may have encountered difficulties with the peer review process, there is no indication that they resulted from gender discrimination.[8]

In addition, the two major workplace confrontations that plaintiff describes, which occurred on September 15 and September 28, 1999, did not involve any gender-related, discriminatory conduct by plaintiff's co-workers. Unlike other cases in which gender discrimination has been found, there were no gender-based comments made, or any actions from which one could infer a gender bias. *See, e.g., Raniola v. Bratton,* 243 F.3d 610, 621–22 (2d Cir.2001) (describing facts that would support a case of gender discrimination). Although plaintiff may have felt unfairly targeted in these situations, he is required to show that this treatment resulted from attitudes towards his gender. *See Oncale,* 523 U.S. at 81, 118 S.Ct. 998. However, none of the facts alleged support such a finding. Repeating the conclusory and unsubstantiated allegation that he was subject to ongoing "gender bias" is simply insufficient to turn plaintiff's conflicts with his co-workers into a valid cause of action under Title VII.

In an attempt to suggest that he was targeted because of his gender, plaintiff contends that evidence links the commencement of his female co-workers' con-

---

8. There is indication in the record that plaintiff had similar conflicts with male co-workers. Plaintiff relates an incident in which David Wurtz, another forensic scientist, after questioning the accuracy of a test that plain-

tiff had performed, reported his concern to officials at NYSP headquarters. Plaintiff recalls feeling resentful towards Wurtz for his actions. (Graziano Dep. at 122–24.)

duct with Kantha's filing of a "gender-sensitive" sexual harassment claim against him in 1992. (Pl. Mem. Opp. Summ. J. at 22.) It must first be noted, however that the earliest specific incident of alleged harassment described by plaintiff in support of this action occurred in 1999, nearly eight years after the filing of the Kantha complaint.[9] More importantly, even if his co-workers' conduct coincided with the filing of the Kantha complaint, it would not support a finding of gender discrimination. Plaintiff cites no support for the contention that attitudes developed towards an employee who has been accused of sexual harassment in any way relate to animus directed at gender. Nor do we believe that any such nexus can be established. In addition, the scant gender-specific conduct described by plaintiff is merely trivial. For example, the fact that a male supervisor assigned a task within plaintiff's field of specialty to a more junior female employee is inconsequential. Similarly insignificant is the incident in which Beach's husband, who was not a co-worker of plaintiff, yelled after him that he had "no balls." (Graziano Aff. ¶ 7(aaa).) "A plaintiff pursuing a sex-based hostile work environment claim 'must always prove that the conduct at issue was not merely tinged with offensive connotations, *but actually constituted discrimination because of sex.*'" *Raniola*, 243 F.3d at 621 (emphasis added) (quoting *Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998). We conclude that no rational factfinder could find from the evidence presented that plaintiff suffered adverse treatment on the basis of gender.

### B. Constructive Discharge

"A constructive discharge claim is established by showing the employer deliberately created intolerable working conditions in an effort to force the employee to resign." *Dean v. Westchester County Dist. Attorney's Office*, 119 F.Supp.2d 424, 430 (S.D.N.Y.2000) (Conner, J.). In determining whether there has been a constructive discharge, "the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983) (quotation omitted). "[M]ere dissatisfaction of work assignments, unfair criticism, or working conditions that can be categorized as unpleasant do not constitute a constructive discharge." *Id.* Plaintiff's constructive discharge claim fails for the same reasons as his hostile work environment claim. Other than alleging that the NYSP sided with his female co-workers, and failed to adequately address his complaints concerning their harassing conduct, plaintiff does not assert any independent basis for imputing gender discrimination against the NYSP. Thus, because plaintiff has failed to adduce evidence to support the contention that his co-workers' conduct was gender-related, any neglect by the NYSP in remedying the situation is not actionable under Title VII.

Because we conclude that plaintiff has failed to produce evidence that he suffered discrimination on the basis of gender, we

9. In his affidavit submitted in opposition to defendant's motion for summary judgment, plaintiff describes numerous incidents between Kantha and himself that began soon after the Kantha complaint was filed. (Graziano Aff. ¶ 7.) However, plaintiff explains that this situation improved in 1994 after NYSP officials removed two counseling notifications, concerning his contact with Kantha, from his personnel file. (*Id.* ¶¶ 7(aa)–(cc).) Kantha had left the lab by early 1997. (*Id.* ¶ 7(dd).) Moreover, as defendant points out, there may be a statute of limitations bar to claims relating to the Kantha complaint. (Def. Reply Mem. Supp. Summ. J. at 2.)

need not consider defendant's arguments concerning vicarious liability.

## CONCLUSION

Plaintiff may (or may not) have been the unfortunate target of a conspiracy of his fellow employees who didn't like him and who tried to and did make his work experience extremely unpleasant. But, however malicious and contemptible such conduct might be, if it was not gender-motivated, it would not give rise to an action against their employer under Title VII, without which there is no basis for federal jurisdiction. Defendant's motion for summary judgment is granted and plaintiff's Complaint is dismissed with prejudice.

SO ORDERED.