**Esteban E. SARMIENTO, Plaintiff,**

v.

**QUEENS COLLEGE CUNY, Defendant.**

No. 01 CV 5266(SJ).

United States District Court, E.D. New York.

Feb. 11, 2005.

Outten & Golden by Kathleen Peratis, New York City, for Plaintiff.

Office of the Attorney General by Benjamin J. Lee, New York City, for Defendant.

### MEMORANDUM AND ORDER

JOHNSON, Senior District Judge.

Plaintiff brings this action against Defendant Queens College City University of New York ("CUNY" or "Defendant") alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.* ("Title VII") based on Defendant's decision not to grant Plaintiff interviews for Associate Professor positions in the CUNY Department of Anthropology in November 1999 and April 2000.

Presently before this Court is Defendant's Motion for Summary Judgment. Defendant asserts that Plaintiff has failed to establish *prima facie* cases of discrimination in either of the two instances, and that if Plaintiff has established *prima facie* cases, Defendant should nevertheless prevail because Defendant has proffered proof of legitimate, non-discriminatory reasons for the hiring decisions.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "On a motion for summary judgment, the moving party has the burden of showing the absence of a genuine issue of material fact, and the district court's task is limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998). In deciding such a motion, this Court "must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Id.*

Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact, *see D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir.1998), and are "insufficient to raise a jury question as to whether [plaintiff] was in fact the victim of discrimination." *Irvine v. Video Monitoring Services of American,* 2000 WL 502863, at *3 (S.D.N.Y.2000).

## DISCUSSION

In order to survive a motion for summary judgment, a Title VII plaintiff must satisfy a three-part burden-shifting test. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

First, a plaintiff must establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class; (2) he is qualified to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. *See Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). A plaintiff's burden to establish a *prima facie* case of discrimination is *de minimis*. *See Fisher v. Vassar College,* 114 F.3d 1332, 1335, 1340 n. 7 (2d Cir.1997).

Second, if the plaintiff has succeeded in establishing the *prima facie* case, a presumption of discrimination arises and the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision. *Id.*[1] If the defen-

---

**1.** One of the most commonly offered justifications for a decision not to hire or promote an individual is that the applicant is not sufficiently qualified. *See Gregory v. Daly,* 243 F.3d 687, 696 (2d Cir.2001). The Second Circuit has stated that unless a plaintiff fails to make even the *de minimis* showing that he is qualified for the job as required for a *prima facie* case, a defendant's argument that a plaintiff was insufficiently qualified is best dealt with in the second stage of the burden-

shifting in order to ensure that the *prima facie* qualification requirement is not "interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Id.; see also Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 92 (2d Cir. 2001) (stating that defendant's argument that the plaintiff was unqualified should be treated as defendant's proffer of a legitimate, non-

dant offers such a reason, the presumption of discrimination created by the *prima facie* case disappears, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).[2]

In the third stage of the three-part burden-shifting analysis, the plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

The Second Circuit has pointed out that "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir.1985). Courts have therefore granted summary judgment at the pretext stage where a plaintiff has "provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext." *Hoyt v. Dept. of Children and Families*, 309 F.Supp.2d 299, 307 (D.Conn. 2004) (citing *Meiri*, 759 F.2d at 997; *Dister v. Continental Group*, 859 F.2d 1108 (2nd Cir.1988); *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir.1998)).

This Court must therefore review the materials submitted by both parties in order to determine first, whether Plaintiff has established a *prima facie* case; second, whether Defendant has proffered a legitimate, race-neutral reason for their decisions; and third, whether Plaintiff has pointed to some evidence that would reasonably support a finding of a Title VII violation. This analysis will be conducted separately for each of the two jobs that Plaintiff applied for, and for Plaintiff's retaliation claim.

## THE FALL 1999 POSITION

After the unexpected death of a professor in the Queens College Department of Anthropology, Defendant advertised for an assistant professor of anthropology for a one-semester substitute appointment for the Fall of 1999. (Def. Mem. Law Supp. Mot. Summ. J. at 4.) The search to fill the position was an "informal process" which was conducted by Professors Sara Stinson and Sharon Gursky ("the search committee members," or "Defendant's decision-makers"). (*Id.* at 4—5.) The job description for the Fall 1999 position stated:

Position requires teaching an introductory human osteology course, an upper level undergraduate course in human evolution, and a third intermediate/advanced undergraduate biological anthropology course of the applicant's choosing. . . . Please send cv, names/addresses/emails/telephones of 3 references, example course syllabi, and

discriminatory reason for the decision rather than as evidence defeating plaintiff's *prima facie* case).

**2.** Plaintiff appears to argue that this Court cannot consider the testimony of Defendant's decision-makers because the statements do not come from disinterested witnesses. (*E.g.* Pl.'s Mem. Law. Opp'n Def.'s Mot. Summ. J. at 16–17.) However, given the Supreme Court's mandate that courts conduct a three-stage burden-shifting analysis in which the

burden is on the defendant, in stage two, to offer a legitimate, non-discriminatory basis for the decisions that were made, it is evident that this Court must consider Defendant's proffered arguments regarding the legitimate, non-discriminatory basis of their decisions. This Court does not, in any case, find it necessary to rely on Defendant's assertions made during the course of litigation, given the documentation of the various candidates' qualifications and of the Defendant's decision-making process.

letter of application detailing teaching experience[.]

(Stinson Decl. Ex. A.)

Defendant received seven applications for the Fall 1999 position, and Professors Gursky and Stinson recommended three choices to the Anthropology Department Personnel and Budget Committee: Charles Hilton, Ellen Miller, and Stacie Burke. (Def. Mem. Law Supp. Mot. Summ. J. at 5 (citing Stinson Decl. ¶ 6; Gursky Decl. ¶ 6).) The Queens College Anthropology Department Personnel and Budget Committee adopted this ranking order and recommended Professor Hilton to the Dean of Social Sciences, who in turn recommended him to the Queens College Provost. (*Id.* at 5.) The Provost recommended Professor Hilton to the President of Queens College, who authorized the Anthropology Department to offer him the position. (*Id.* at 5.)

### Stage One: Plaintiff's *Prima Facie* Case

■ Plaintiff must establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class; (2) he is qualified to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. *See Farias*, 259 F.3d at 98.

■ With respect to the Fall 1999 position, Defendant asserts that Plaintiff cannot establish the fourth prong of the *prima facie* case because Defendant hired Charles Hilton, who is also Hispanic. (Def.'s Mem. Law Supp. Mot. Summ. J. at 17.) However, this Court finds that there is a disputed issue of fact regarding the search committee's knowledge of Charles Hilton's Hispanic ethnicity at the time of the decision-making process (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 5—6), such that Hilton's hiring does not necessarily defeat the existence of circumstances giving rise to an inference of discrimination. Since this is the only argument Defendant offered in support of the claim that Plaintiff failed to establish a *prima facie* case, this Court will assume, *arguendo*, that Plaintiff established a *prima facie* case.

### Stage Two: Defendant's Proffered Race–Neutral Basis for the Hiring Decision

■ Defendant asserts that they have established a legitimate, non-discriminatory basis for their decisions regarding interviews and hiring for the Fall 1999 position, "namely that the individual selected (Professor Hilton) was more qualified than plaintiff." (Def.'s Mem. Law Supp. Mot. Summ. J. at 2.)

Whether an individual is "qualified" for a job must be assessed in relation to the criteria the employer has specified for the position, not criteria that seem reasonable to the litigant,[3] *Belgrave v. Pena*, 2000 WL 1290592, at *11 (S.D.N.Y. Sept. 13, 2000), or to this Court. *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir.1997). Defendant's decisions regarding the professional experience and characteristics

---

**3.** It is quite likely that Plaintiff is in many respects a skilled and experienced researcher, who has gained the respect of many of his colleagues. (Peratis Decl. Ex.'s 2–4.) Plaintiff has also evidently published a substantial number of articles. (Stinson Decl. Ex. B.) However, Title VII does not deprive Defendant of the right to prioritize teaching experi- ence over number of articles published, or over field research experience as compared to classroom experience. Plaintiff may be correct that he is in important senses qualified for many jobs in his field; however, that does not obligate Defendant to consider him qualified for the jobs they had available.

sought in a candidate, as well as the search committee's evaluation of Plaintiff's qualifications, are entitled to deference. *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Lieberman v. Gant*, 630 F.2d 60 (2d Cir.1980); *Faro v. New York Univ.*, 502 F.2d 1229, 1231–1232 (2d Cir.1974); *Bickerstaff v. Vassar College*, 196 F.3d 435, 455–456 (2d Cir.1999).[4] The role of this Court is not to evaluate the wisdom of personnel decisions, but merely to determine whether the decisions were rational and non-discriminatory. *Tarshis v. Riese Org.*, 211 F.3d 30, 37 (2d Cir.2000). This Court will therefore review the evidence on record in light of the criteria Defendant stated that the search committee members were seeking. *See Thornley*, 104 F.3d at 29.

Defendant asserts that Professors Gursky and Stinson recommended Professor Charles Hilton as the first choice because "(1) he had previously taught a number of courses very similar to those that the substitute professor would be expected to teach in the fall; (2) he was a student of Professor Erik Trinkaus, one of the premier human evolutionists for Neanderthals in the country, who recommended Professor Hilton for the position; (3) Professor Hilton's teaching recommendations attested to his superior teaching ability and (4) Professor Gursky was a student with Professor Hilton at the University of New Mexico and believed that he was capable of teaching the courses the substitute professor was scheduled to teach." (Def.'s Mem. Law Supp. Mot. Summ. J. at 6 (citing Stinson Decl. ¶¶ 6—7, Ex. C; Gursky Decl ¶ 7).) Defendant has further stated that Gursky, based on her acquaintance with Hilton at the University of New Mexico, "had a high opinion of his collegiality and thoughtfulness as an anthropologist." (Def.'s R. 56.1 Stmt. ¶ 17.)

Defendant asserts that Professor Ellen Miller was recommended as the second choice because "(1) she had recent teaching experience at the University of North Carolina at Chapel Hill teaching courses similar to those that the substitute professor would teach; (2) her letters of recommendation praised her teaching ability; and (3) Professor Miller was a promising young scholar who had received five grants and recently published four articles." (Def.'s Mem. Law Supp. Mot. Summ. J. at 6–7 (citing Stinson Decl. ¶ 8, Ex. D).)

Defendant asserts that Professor Stacie Burke was recommended as the third choice because "(1) she was currently teaching a biological anthropology course at the University of Toronto covering areas that the new substitute professor would teach in the Fall and (2) she had received an award from the University of Toronto for excellence in undergraduate teaching." (Def.'s Mem. Law Supp. Mot. Summ. J. at 7 (citing Stinson Decl. ¶ 9–10, Ex. E.).)

Defendant asserts that Professors Stinson and Gursky did not recommend Plaintiff for further consideration because "(1) his application did not demonstrate any recent experience teaching anthropology; (2) his position as a research associate for the Museum of Natural History was not impressive, particularly for a candidate who had received his Ph.D. in 1985; and (3) the sample syllabi that he submitted

---

4. This Court declines to adopt Plaintiff's argument that these cases are distinguishable from the case at bar because they deal with denial of tenure (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 18–19). The cases cited by Plaintiff counsel, *e.g., Lieberman,* 630 F.2d 60, merely stand for the proposition that individuals seeking tenure must meet a higher standard than individuals seeking re-appointment for only another year, not for the proposition that Universities' academic freedom should be restricted at the time of hiring.

did not correspond to the Anthropology Department's need for an individual to teach undergraduate courses such as upper level human evolution. Rather, plaintiff submitted sample syllabi for a graduate course in primate comparative and functional anatomy and an introductory course in human evolution, whereas the job listing sought a candidate to teach undergraduate introductory human osteology, an upper level course in human evolution and an intermediate/advanced biological anthropology course." (Def.'s Mem. Law Supp. Mot. Summ. J. at 7–8 (citing Stinson Decl. ¶ 10, Ex. B).)

In summary, Defendant asserts that their determination regarding whom to interview was based on the criteria of: current or recent experience teaching similar courses to those listed in the 1999 position description, recommendation by experts in the field, evidence of superior teaching ability, quality of sample syllabi, and personal knowledge of the applicant. None of these criteria are on their face suspect for purposes of Title VII. However, Plaintiff argues that Defendant did not review Plaintiff's application and challenges Defendant's assertions regarding the relative merits of the candidates. (Pl. R. 56.1 Stmt. ¶¶ 1–16.) This Court must review Defendant's asserted criteria in relation to the evidence of the qualification of the candidates, including Plaintiff, in order to determine whether Defendant has proffered sufficient evidence to establish legitimate, non-discriminatory reasons for the hiring decisions.

### Previous Experience Teaching Similar Courses

The posting for the Fall 1999 position stated that the job involved teaching an introductory human osteology course, an upper level undergraduate course in human evolution, and a third intermediate/advanced undergraduate biological anthropology course. (Stinson Decl. Ex. A.)

According to the cover letter submitted by Charles Hilton in his application for the position, the courses he had previously taught included Introduction to Biological Anthropology, Introduction to Human Evolution, Hominid Functional Morphology, Human Skeletal Biology, Human Anatomy and Physiology, Introduction to Biology, Genetics, Introduction to Anthropology, and human anatomy and physiology labs. (Stinson Decl. Ex. C.) In his letter he expressed an interest in teaching Human Biology, Human Paleobiology, Issues in Human Skeletal Biology, Human Biomechanics, and Pleistocene Hominid Foragers. (*Id.*) From Charles Hilton's curriculum vitae ("CV"), it is apparent that he was employed teaching in the Department of Anthropology at the University of New Mexico at the time that he applied for the Fall 1999 position. (*Id.*)

According to Ellen Miller's cover letter, at the time she applied for the Fall 1999 position she was teaching Human Evolution & Adaptation, Human Osteology, and Paleoanthropology. (Stinson Decl. Ex. D.) In her cover letter she expressed a specific interest in teaching Introduction to Biological Anthropology, Paleoanthropology, Human Evolution, Human Osteology, Primate Evolution, Primate Ecology and Behavior, Primate Paleobiology, and Zooarcheology. (*Id.*) From her CV, it is evident that she was employed teaching in the Department of Anthropology at the University of North Carolina. (*Id.*)

According to Stacie Burke's cover letter, at the time she applied for the Fall 1999 position she was teaching a Biological Anthropology course that covered the topics of human osteology, primatology, and human evolution. (Stinson Decl. Ex. E.) From her CV, it appears that at the time she applied she was teaching an anthropology course in the Department of Social Sciences at the University of Toronto.

(*Id.*) Her cover letter addressed her ability to teach the specific courses mentioned in the job description for the Fall 1999 position, and expressed an interest in teaching Anthropological Demography, Medical Anthropology, and Human Adaptability classes. (*Id.*)

Plaintiff's cover letter to his application for the Fall 1999 position states that he previously taught undergraduate courses in physical anthropology/human evolution, human osteology, human variation, zooarcheology, genetics, and growth and development, and graduate courses in biostatistics and morphometrics, primate anatomy, and primate systematics. (Stinson Decl. Ex. B.) It states that he was presently working as a research associate at the American Museum of Natural History in New York. (*Id.*) The letter does not mention specific courses that Plaintiff hoped to teach at CUNY. (*Id.*) From Plaintiff's CV, it appears that at the time that he applied for the Fall 1999 position he was not employed in any academic teaching position. (Pl.Ex. 29.) His most recent academic position was in 1997, when he was employed in the Department of Biology at CUNY. (*Id.*) He had not been employed in a Department of Anthropology since 1988, having taught in Departments of Biology and Anatomy since that time. (*Id.*)

In summary, Plaintiff's application is clearly distinguished from those of the other three candidates by the fact that he was the only one of the four who was not presently employed in an academic teaching position at the time of the application. Additionally, Plaintiff had not obtained a position teaching in an anthropology department for nearly ten years, while the top two choices for the position were currently employed in departments of anthropology and the third choice was currently employed in a department of social sciences teaching anthropology. The other candidates not only had current or recent

experience teaching similar classes to those mentioned in the job description, but had obtained jobs teaching such classes in anthropology departments, to undergraduate anthropology students. Plaintiff's cover letter was also the only one that did not mention anthropology courses that he would like to teach at CUNY. All of these factors support Defendant's contention that their decision regarding the candidates' ranking was guided by the candidates' differing levels of recent, relevant job experience. This Court finds that Defendant's application of the stated hiring criteria was not inconsistent and that there is substantial evidence that Defendant reasonably considered Plaintiff less qualified for the job under this criterion.

*Recommendation by Experts in the Field*

Defendant states that the reason that Charles Hilton was ranked in first place was that he was recommended by an expert in the field, Erik Trinkaus, with whom Hilton had previously studied. (Def.'s Mem. Law Supp. Mot. Summ. J. at 6.) Plaintiff contends that "the mere fact of having 'studied with' a great expert says nothing about one's own merit." (Pl. R. 56.1 Stmt. ¶ 5(a).) However, the belief that an applicant's qualifications are informed by who that applicant has studied with is clearly a rational one, and is not suspect for Title VII purposes. Plaintiff also states that Erik Trinkaus is not fairly described as a great authority in evolution since he was not mentioned by Professor Stinson in her deposition. (Pl. R. 56.1 Stmt. ¶¶ 5(a)—5(b).) In response, Defendant submitted a biography of Erik Trinkaus from the Washington University website, which states that "Erik Trinkaus is considered by many to be the world's most influential scholar of Neandertal biology and evolution." (Stinson Reply Decl. Ex. A.) It is not necessary for this Court to decide whether Erik Trinkaus is or is not

the world's leading scholar in this area, because it is clear that Defendant could rationally have believed that his recommendation should carry some weight when evaluating Charles Hilton's application. Title VII does not obligate Defendant to be correct in their assessment of his status as an expert, it only obligates Defendant to base their actions on non-discriminatory considerations. *See Gilman v. Runyon,* 865 F.Supp. 188, 193 (S.D.N.Y.1994) ("an 'employer's judgment in selecting and applying subjective criteria may be poor, and it may be erroneous' as long as it is not discriminatory") (quoting *Judge v. Marsh,* 649 F.Supp. 770, 781 (D.D.C.1986)); *Williams v. NYC Dept. of Sanitation,* 2001 WL 1154627, at *18 (S.D.N.Y. Sept. 28, 2001) ("This Court may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom."); *Faldetta v. Lockheed Martin Corp.,* 2000 WL 1682759, at *9—10 (S.D.N.Y. Nov. 9, 2000) ("[A]bsent evidence of discrimination, it is not the province of the Court to sit as a super-personnel department that reexamines an entity's business decisions.")

Plaintiff's application for the Fall 1999 position included a list of references, consisting of Professor Maciej Henneberg, Professor Leslie Marcus, Dr. Thomas Butynski, and Professor Michael Rose (Stinson Decl. Ex. B), but his application does not appear to have been accompanied by any letters of recommendation, as no letters were supplied by either party. Plaintiff asserts that he has studied with prominent experts in the field, who are recognized as such by Defendant, including Clifford Jolly, John Fleagle, and Richard Wrangham. (Pl. R. 56.1 Stmt. ¶ 5(c).) However, Plaintiff's work with Jolly, Fleagle, and Wrangham was not made evident

to Defendant in Plaintiff's cover letter, CV,[5] or list of references submitted in his application for the Fall 1999 position. (*See* Stinson Decl. Ex. B.) Therefore, Defendant clearly could not be expected to have known of his work with these individuals at the time of the application. Title VII focuses on the information that was available to Defendant at the time of the decision, not information provided subsequently, during the course of litigation. *See, e.g., Anderson v. Delphi Automotive Systems Corp.,* 297 F.Supp.2d 625, 628 (W.D.N.Y.2004) ("The [employment] decision ... must be judged at that time, not in hindsight"); *Taylor v. Polygram Records,* 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999) (employer's decision must be evaluated "without the intrusion of third-party hindsight").

Since Defendant did not allege that the decision to interview Ellen Miller or Stacie Burke was based on recommendation by any particular expert, Charles Hilton's recommendation from Erik Trinkaus cannot credibly provide the sole explanation for why Charles Hilton was interviewed and Plaintiff was not. However, since Charles Hilton also was ranked above the other two candidates, it is plausible that this recommendation was one reason that Hilton was ranked above Plaintiff and the other candidates.

*Evidence of Superior Teaching Ability*

Charles Hilton's letters of recommendation contain a number of positive references to his teaching ability. (Stinson Decl. Ex. B.) His letter from Erik Trinkaus states that "it is his breadth of experience and interest that strengthens his value as a researcher, colleague and especially teacher," that "his work lends itself easily to both research and teaching col-

---

5. Jolly, Fleagle, and Wrangham are not listed as co-authors on any of Plaintiff's publications or conference abstracts.

laboration," and that he "has diverse experience in teaching" which "is being augmented currently with additional experience." (*Id.*) Hilton's letter from Jane Buikstra states:

> He has an inquiring mind and draws effectively on the breadth of his background in both collegial discussions and teaching situations. I was especially impressed with the organization and rigor of Dr. Hilton's recently-taught course in skeletal biology. Drawing on his experience in teaching human anatomy, he developed a class that was more than the usual "introduction to bones." ...
> While I did not attend lectures, I understand from the teaching assistants that they were detailed, yet engaging and clearly delivered.

(*Id.*) It also states that Hilton "would be an effective teacher" in the areas of functional anatomy, paleoanthropology, and skeletal biology. (*Id.*) Hilton's letter from Jeffery Long states that "He has more teaching experience than the average recent Ph.D. Moreover, he has taught a variety of courses, and he is experienced in teaching both biology and anthropology students." (*Id.*)

Ellen Miller's letter of recommendation from Gregg Gunnell states that "She is a passionate teacher and has an uncanny ability to relate with students both as a lecturer and one on one," and that, as a teaching assistant, she "was a dedicated and enthusiastic instructor." (Stinson Decl. Ex. D.) Her letter from Tab Rasmussen states that she "has all the tools to become an outstanding researcher, teacher and colleague[.]" (*Id.*) Her letter from Clark Larsen states that "very importantly, students have told me that she is a wonderful teacher." (*Id.*)

Stacie Burke's application apparently did not include letters of recommendation. (Stinson Decl. Ex. E.) However, her CV indicates that she was given an award for excellence in undergraduate teaching. (*Id.*) She also pointed out this award in her cover letter, and explained further that "[a]ccording to the letter from the Chair of the College Council which accompanied the award, student comments included: 'excellent communicator,' 'encouraged students' involvement', and 'simply amazing.'" (*Id.*) Her cover letter devotes substantial discussion to her interest in and commitment to teaching, including comments such as "students seem to sense an extra richness and enthusiasm when learning about firsthand research" and "simply put, I enjoy teaching [and] find the experience rewarding and stimulating," as well as a reference to her "attempts to capture the attention of students in the classroom and enliven their in-class experience." (*Id.*)

In contrast, Plaintiff's CV makes no mention of any teaching awards (Stinson Decl. Ex. B) and his application did not include any letters of recommendation. The application was therefore completely lacking in any information regarding Plaintiff's teaching skills. (*Id.*) In attempting to establish his superior qualifications, Plaintiff again relies on information that was not made available to Defendant at the time that they were considering his application. Plaintiff asserts that he has received "significant honors," including a Fulbright Fellowship for teaching and research and the "best teacher" award at the University of Witswatersrand. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 3.) These honors were not listed on Plaintiff's CV when it was submitted for the Fall 1999 position, nor were they mentioned in Plaintiff's cover letter to his application. (Stinson Decl. Ex. B.) There was, therefore, no way for Defendant to take this information into account when considering Plaintiff's application. Title VII does not require Defendant to consider information that was not available at the time. *See Anderson*, 297 F.Supp.2d at

628; *Taylor,* 1999 WL 124456, at *10. This Court finds that Defendant's application of the stated hiring criteria was not inconsistent and that there is substantial evidence that Defendant reasonably considered Plaintiff less qualified for the job under this criterion.

*Sample Syllabi*

The posting for the Fall 1999 position stated that candidates should submit example course syllabi for an introductory human osteology course, an upper level undergraduate course in human evolution, and a third intermediate/advanced undergraduate biological anthropology course. (Stinson Decl. Ex. A.)

Charles Hilton submitted five sample syllabi, for the following courses: Anthropology 101: Introduction to Anthropology; Anthropology 351: Human Skeletal Biology; Anthropology 357: Paleoanthropology/Human Origins; Anthropology 451: Human Paleobiology; Anthropology 452: Hominid Functional Morphology. (Stinson Decl. Ex. C.) Ellen Miller submitted sample syllabi for the following courses: Anthropology 43: Human Evolution and Adaptation; Anthropology 112: Paleoanthropology; and Anthropology 114; Human Osteology. (Stinson Decl. Ex. D.) Stacie Burke submitted sample syllabi for Introductory Osteology, Human Evolution, and Anthropological Demography. (Stinson Decl. Ex. E.) Nowhere does Plaintiff contend that these sample syllabi failed to meet the description in the Fall 1999 position posting. (*See* Pl. R. 56.1 Stmt.; Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J.; Pl. Decl. of Sept. 4, 2003; Tobias Decl. Supp. Pl. Opp'n Def.'s Mot. Summ. J.; Henneberg Decl. Supp. Pl. Opp'n Def.'s Mot. Summ. J.)

In contrast, Plaintiff admits to the truth of Defendant's statement that "Plaintiff's sample syllabus submitted as part of his application was for a graduate course titled Primate Comparative and Functional Anatomy and an undergraduate course titled Introduction to Human Evolution" and that "Plaintiff's syllabus did not match the Department's job listing[.]" (Defs. R. 56.1 Stmt. ¶¶ 29–30; Pl. R. 56.1 Stmt. ¶ 13.) It is evident from Plaintiff's own exhibits that Plaintiff entitled one of his sample syllabi "Syllabus for Graduate Course in Primate Comparative and Functional Anatomy" (Pl.Ex. 28) despite the fact that the job description stated that the courses would be at the introductory/undergraduate level, not the graduate level. (Stinson Decl. Ex. A.) The other two syllabi submitted by Plaintiff do not specify that they are at the graduate level, but this still leaves Plaintiff short of the three undergraduate course syllabi requested in the job description. Defendant was clearly entitled to give preference to candidates who submitted syllabi that matched the courses that they would be teaching if offered the position. This Court finds that Defendant's application of the stated hiring criteria was not inconsistent and that there is substantial evidence that Defendant reasonably considered Plaintiff less qualified for the job under this criterion.

*Personal Knowledge of the Applicant*

Defendant asserts that part of the basis for giving top preference to Hilton was that Professor Gursky was a student with Professor Hilton at the University of New Mexico and believed that he was capable of teaching the courses the substitute professor was scheduled to teach. (Def.'s Mem. Law Supp. Mot. Summ. J. at 6 (citing Stinson Decl. ¶¶ 6–7, Ex. C; Gursky Decl ¶ 7).) Defendant has further stated that Gursky, based on her acquaintance with Hilton at the University of New Mexico, "had a high opinion of his collegiality and thoughtfulness as an anthropologist." (Def.'s R. 56.1 Stmt. ¶ 17.)

Plaintiff does not contest the truthfulness of these statements, but asserts that

Gursky's personal knowledge of Hilton is not a material fact and does not distinguish Hilton from Plaintiff because "Plaintiff too is collegial and experts have a high opinion of his thoughtfulness as an anthropologist." (Pl. R. 56.1 Stmt. ¶ 6.) Once again, however, Plaintiff is attempting to rely on information that was not available to Defendant at the time the hiring decision was made, despite the fact that Title VII is concerned with the knowledge and intent of the decision-makers at the time of the adverse employment action. *See Anderson,* 297 F.Supp.2d at 628; *Taylor,* 1999 WL 124456, at *10. Evidently, many individuals in the field have a great deal of respect for Plaintiff's work and consider him collegial and pleasant to work with. (*See* Peratis Decl. Ex's. 2, 3.) However, having neither personal acquaintance with Plaintiff nor letters of recommendation accompanying Plaintiff's application, Defendant had no way of knowing of Plaintiff's collegiality and thoughtfulness.

### Stage Three: Pretext

■ The Court finds that there is substantial evidence, described above, indicating that the other applicants were not only more qualified but also made their qualifications evident to Defendant, rather than expecting Defendant to take into account qualifications not mentioned in their CVs or letters of recommendation. In order to overcome this evidence and defeat Defendant's Motion for Summary Judgment, Plaintiff must offer evidence that the criteria discussed above were merely pretextual. *See, e.g., Reeves,* 530 U.S. at 143, 120 S.Ct. 2097.

In support of the contention that Defendant's assertions are pretextual, Plaintiff claims that a number of misstatements were made by Defendant and that these asserted misstatements "were so blatant and frequent that, a jury easily can conclude, the only logical explanation is that they were intentional pretexts." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 19.) Plaintiff points specifically to the statements that Professor Hilton identified himself as Hispanic during an interview, that Defendant was not aware of Plaintiff's ethnicity during the hiring process, and that Professor Hilton's letters attest to his superior teaching ability. (*Id.*) Plaintiff also argues that pretext is demonstrated by the fact that he was far more qualified for the 1999 position, as evidenced by Professor Henneberg's statements to that effect. (*Id.* at 20.)

With respect to Plaintiff's contention that "*none* of [Professor Hilton's] letters says anything" about his superior teaching ability, as discussed above Hilton's letters in fact include a number of very positive statements about his teaching ability, not only "the fact of his teaching." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 19.) For example, his letter from Trinkaus states that "it is his breadth of experience and interest that strengthens his value as a ... teacher" (Stinson Decl. Ex. B) and his letter from Jane Buikstra praises the "organization and rigor" of a class Hilton recently taught, also describing the course as "engaging and clearly delivered." (*Id.*) There is no basis for belief that Defendant's arguments regarding Hilton's teaching skills were pretextual.

In terms of Defendant's knowledge of Hilton's ethnicity, the issue of whether Professor Welch knew of Hilton's ethnicity (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 6, 12) is irrelevant with respect to the 1999 hiring decision because *Welch was not involved in that decision.* Sharon Gursky stated during depositions that she knew Hilton was Hispanic because she knew him personally from the University of New Mexico and knew that his mother was Mexican. (Gursky Depo. at 43.) Stinson asserted that she knew Hilton was Hispanic before making the

hiring decision because Gursky told her of this fact. (Stinson Depo. at 40.) Defendant's letter to the Equal Employment Opportunity Commission, however, stated that "Professor Stinson recalls that Dr. Hilton voluntarily identified himself during the interview process as being of Hispanic descent." (Peratis Decl. Ex. 5.) Stinson pointed out during depositions that the assertion in the EEOC letter cannot be correct because there was no interview process for the 1999 position. (Stinson Depo. at 79.) The statement in the EEOC letter was clearly inaccurate. However, this Court finds that there is little to no evidence that Stinson and Gursky did not know of Hilton's ethnicity; the letter therefore only misrepresents the manner in which they were informed of his ethnicity, not the fact of their knowledge. The Court finds that a single misstatement in a letter addressing complicated factual and legal issues underlying four separate hiring decisions (Plaintiff's original claims regarding hiring decisions in 1997, 1999, 2000, and 2001) is insufficient to establish a viable claim of pretext.

With respect to Defendant's knowledge of Plaintiff's ethnicity, there do exist certain inconsistencies in Defendant's statements regarding knowledge of Plaintiff's ethnicity. Defendant has claimed that the Committee members were not aware of Plaintiff's race or national origin prior to the hiring for either the Fall 1999 position or the 2000 position. (*E.g.* Def.'s Repl. Mem. Further Supp. Mot. Summ. J. at 13.) However, Sharon Gursky stated that she knew he was "Latin American" though not that he was Argentinian. (Gursky Depo. at 33.) It is likely that Sara Stinson knew that Plaintiff was Hispanic given his identifiably Hispanic name. This Court nevertheless finds that this inconsistency is insufficient to raise a material issue of fact regarding pretext, because the evidence is minor and inconclusive as compared to the overwhelming evidence that Defendant

chose not to hire Plaintiff for exactly the reason they stated, i.e. due to the other candidates' superior qualifications.

As for Plaintiff's contention that he was far more qualified than Hilton for the job, this Court has already addressed the issue of Plaintiff's qualifications and determined that Hilton provided Defendant with substantially more evidence that his experience and qualifications matched the criteria Defendant sought. *See Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2d Cir.1996) (plaintiff's "personal belief that she was the most qualified person for the various positions" found insufficient to defeat summary judgment by raising material issue of fact regarding pretext where "facts ... indicate that the people who received the promotions had more experience than plaintiff").

### Conclusion

Defendant offered legitimate, non-racial, non-pretextual bases for their decisions, namely that the candidates who were selected for interviews were more qualified than Plaintiff. These claims were supported by substantial evidence conclusively demonstrating that the candidates who were interviewed met the criteria sought by Defendant to a considerably greater degree than Plaintiff. Plaintiff failed to prove that their stated bases for the decision were pretextual or that discrimination was even one factor motivating Defendant's decision-makers. Given the dearth of "concrete particulars" supporting a finding of discrimination and the fact that Plaintiff has "provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext," summary judgment is appropriate with respect to Plaintiff's claims regarding the 1999 position. *Hoyt,* 309 F.Supp.2d at 307; *Zimmermann v. Assoc.'s First Capital Corp.,* 251 F.3d 376, 382 (2d Cir.2001); *Meiri,* 759 F.2d at 997.

## THE FALL 2000 POSITION

Queens College issued a vacancy notice, dated October 8, 1999, for a position as Assistant Professor of Biological Anthropology beginning in the Fall of 2000. (Stinson Decl. Ex. F.) The vacancy notice stated that the required qualifications were a Ph.D. in anthropology and demonstrated excellence in research and undergraduate teaching and research specializations, including human evolution and human skeletal biology or primate evolution. (*Id.*) The Queens College Anthropology Department formed a Search Committee consisting of Professors Sara Stinson, Paul Welch, and Sharon Gursky ("the search committee" or "Defendant's decision-makers") to evaluate the candidates. (Stinson Decl. ¶ 12; Gursky Decl. ¶ 9; Welch Decl. ¶ 5.) Forty-three applications were received in response to the notice. (Stinson Decl. Ex. G.)

According to Defendant's internal memoranda produced during the hiring process, the first stage of selection for the Fall 2000 position involved the elimination of 20 out of the original applicant pool of 43 candidates on the basis of whether: 1) their application was complete; 2) they would have a PhD by September 2000; 3) they had a research specialization in human evolution, human skeletal biology, or primate evolution; and 4) they were able to teach paleoanthropology, human osteology, and introductory biological anthropology. (*Id.*) Plaintiff remained under consideration after the first stage of selection. (*Id.*)

Defendant asserts that they then applied a set of eight requirements in order to eliminate candidates from the remaining pool: 1) three letters of recommendation; 2) evidence of teaching performance, either in the form of teaching evaluations or at least one letter of recommendation from someone at an institution where the applicant taught; 3) evidence of active publication; 4) research and most publications focusing on topics other than biomechanics and/or functional morphology; 5) research and publications focusing on fossil hominids and the source of data is the skeleton; 6) research and publication not focusing on teeth; 7) evidence of breadth of teaching, as shown by the applicant having taught at least 5 distinct courses in a Lecturer, Instructor, or professorial title (i.e. not as a Teaching Assistant or Lab Assistant); 8) having obtained at least one external research grant. (Stinson Decl. Ex. H.) This process was documented in internal memoranda produced at the time of selection. (*Id.*) Four individuals (Professors Charles Hilton, Thomas Plummer, David Strait, and Frank L'Engle Williams) were recommended to be interviewed. (Stinson Decl. ¶¶ 25–26, Ex. H.)

Defendant claims that Plaintiff was eliminated from consideration for the 2000 position because he failed to meet four of these criteria: evidence of teaching performance; research and publications focusing on fossil hominids and the source of data is the skeleton; evidence of breadth of teaching; having obtained at least one external research grant. (*Id.*). This Court will examine whether Plaintiff has established a *prima facie* case; whether Defendant has proffered a legitimate, race-neutral reason for the decisions; and whether Plaintiff has pointed to some evidence that would reasonably support a finding of a Title VII violation.

### Stage One: Plaintiff's *Prima Facie* Case

Plaintiff must establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class; (2) he is qualified to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action

occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. *See Farias,* 259 F.3d at 98.

With respect to the 2000 Position, Defendant asserts that Plaintiff failed to establish a *prima facie* case because he was not qualified for the position. (Def.'s Mem. Law Supp. Mot. Summ. J. at 25.) However, a plaintiff's burden to establish a *prima facie* case of discrimination is *de minimis,* and therefore only a *de minimus* showing must be made regarding qualification. *See Fisher,* 114 F.3d at 1335. Additionally, the Second Circuit has stated that the argument that a plaintiff was insufficiently qualified for a position is generally better suited to the second stage of the burden-shifting in order to ensure that the *prima facie* qualification requirement is not "interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory,* 243 F.3d at 696; *see also Slattery,* 248 F.3d at 92. Therefore, the Court will assume, *arguendo,* that Plaintiff has established a *prima facie* case and address Defendant's argument as a proffered race-neutral basis for the decision, in stage two of the *Burdine* burden-shifting analysis.

**Stage Two: Defendant's Proffered Race–Neutral Basis for the Hiring Decision**

Defendant claims that Plaintiff was eliminated from consideration for the 2000 position because he was not qualified for the position, in that he failed to meet four criteria: evidence of teaching performance; research and publications focus on fossil hominids and the source of data is the skeleton; evidence of breadth of teaching; having obtained at least one external research grant. (Def.'s Mem. Law Supp. Mot. Summ. J. at 25; Stinson Decl. Ex. H.) These criteria are not suspect on their face but this Court must examine whether the evidence indicates that the criteria were in fact applied consistently to the candidates.

*Evidence of Teaching Performance*

Plaintiff contends that his letter from Leslie Marcus constituted evidence of teaching performance because it was a letter of recommendation from someone at an institution where the applicant has taught, and contained a positive reference to his teaching abilities. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 7). The parties are in disagreement as to whether the criterion "evidence of teaching performance" meant simply that the candidate showed evidence that he or she had *performed* as a teacher, or meant that the candidate provided evidence that he or she had performed significantly *well* as a teacher. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 7; Gursky Depo. at 135, 162; Welch Depo. at 122–24.) Defendant asserts that they evaluated candidates according to whether they provided sufficient evidence of "excellent" teaching performance (Gursky Depo. at 135, 162; Welch Depo. at 122–24), while Plaintiff asserts that they are "backpedal[ing]" because they originally stated only that they sought evidence of teaching performance, not teaching excellence. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 7.)

The evidence that Defendant sought only proof of teaching performance is the fact that in the grid used to evaluate applicants and in the internal memorandum from Paul Welch to Affirmative Action Officer Valli Cook, the criterion is written as "evidence of teaching performance." (Stinson Decl. Ex. H.) However, this simple phrase does not exclude the possibility that it is meant to indicate that the performance Defendant was concerned about was high-quality performance rather than any performance at all, and both logic and

the evidence support a finding that the criterion be given the meaning propounded by Defendant. Applicants' CVs stated whether or not they had teaching experience, and so to interpret the criterion as referring simply to evidence of *any* teaching performance would presume that the criterion was only meant to indicate whether or not the committee found that candidates provided information to substantiate what was already in their CVs. Most importantly, the posted description of the position states that "demonstrated *excellence* in . . . undergraduate teaching required." (Stinson Decl. Ex. F (emphasis added).) Having stated this requirement from the outset, it is clear that Defendant was not backpedaling in stating that teaching excellence was sought.

It is clear that even though Plaintiff provided evidence of teaching performance, he provided substantially less evidence of the *quality* of his teaching performance than the other candidates who were invited to interview. Plaintiff did not submit any teaching evaluations. (*See* Stinson Decl. Ex. I.) Plaintiff's letter of recommendation from Thomas Butynski states that, "I have had less experience with Dr. Sarmiento 'the teacher'" and does not describe Plaintiff's teaching abilities, concluding only that "I strongly suspect that he is an excellent teacher." (*Id.*) Plaintiff's letter of recommendation from Michael Rose says that "I have had no direct experience of Sarmiento as a teacher," and again only theorizes that if Plaintiff teaches as well as he presents his research "he must surely be an effective teacher." (*Id.*)

Plaintiff's only letter of recommendation that implies any direct acquaintance with Plaintiff's teaching skills devotes less than a quarter of a sentence to Plaintiff's teaching ability, stating, "I highly recommend Esteban to you as an enthusiastic and experienced teacher, a productive re-searcher, and a person who should bring to your department vitality and interest in functional and quantitative morphology and their connections to behavior, ecology, and evolution." (*Id.*) Plaintiff's CV for the 2000 application did not include any mention of any teaching awards, and his cover letter did not discuss any particular teaching interest or skills, except to briefly recite his teaching experience. (*Id.*)

In striking contrast, Thomas Plummer, the candidate who was ultimately hired, submitted eighty pages of student evaluations from multiple anthropology courses he had taught, ranging from a large introductory anthropology class with over 400 students to upper level undergraduate anthropology seminars, as well as forms tabulating the average evaluations by all students in the courses. (Stinson Decl. Ex. L.) These evaluations contain comments such as "Dr. Plummer did an excellent job", "Prof. Plummer is a great teacher & this is a great class!!" and "I truly enjoyed and valued Professor Plummer as an instructor." (*Id.*)

Plummer's cover letter to his application also discussed his interest in teaching, stating that:

> In addition to research, I devote a considerable amount of time to teaching and advising students. I have taught a wide range of courses with consistently high student evaluations. . . . I would be happy to expand my offerings to further complement the curriculum of your department. My first hand experience with East African sites and fossils and my concern with integrating information from a variety of fields provides a stimulating atmosphere for students, and helps draw them into course material. . . . I believe that student instruction and mentoring is an important part of my roles as a professor and I have

always made a point of being accessible to students at all levels of interests. (Stinson Decl. Ex. L.)

David Strait's letters of recommendation also contain very positive references to his teaching skills. His letter from Bernard Wood states that "David's teaching is of a very high standard. He has the 'presence' necessary for a good teacher, he has considerable experience in the classroom and the students give his teaching high ratings." (Stinson Decl. Ex. M.) His letter from Frederick Grine states that:

> In addition to his demonstrated academic qualities, David is also an accomplished teacher. While a graduate student, he was responsible for an upper level undergraduate course on Human Evolution (ANP 330). He received outstanding evaluations from the students, and because of his demonstrated abilities as a teacher, the Graduate School here hired him to run a program aimed at improving the instructional capabilities of other graduate students. By all accounts, this was a successful program.

(*Id.*) His cover letter states that "because of my teaching record as a graduate student, I was selected to supervise a counseling service ... designed to help other graduate students become better teachers. In this role, I observed graduate students during lectures and sections, and provided personalized advice about how to better improve their teaching style." (*Id.*)

Frank L'Engle Williams' letter of recommendation from Laurie Godfrey states that:

> At the University of Massachusetts he has taught or TA'd very diverse topics and has consistently received rave reviews from his students.... In all, he has instructed in 27 classes, and was the stand-alone instructor for 19 of these. Here are excerpts from just one of his recent classes ... 'Frank was an absolutely outstanding instructor. His ener-

gy was unabating and motivational. He really made an effort to involve every student, and was positive towards our individual performances.' 'Very organized, prepared and enthusiastic about the subject. Made the class more interesting by using lab sections." 'He is a great instructor. He was very approachable, clear and organized. He was very excited about what he was teaching, and made me want to learn more about it.'

(Stinson Decl. Ex. N.) His letter from Oriol Pi-Sunyer also comments positively on his teaching abilities. Finally, Williams' letter from H. Martin Wobst states that:

> Frank has always been a great teacher. He has taught beginning and advanced classes in biological anthropology and his teaching repertoire certainly includes all of the courses suggested on your list of desired specialties.... Frank likes teaching: when he taught for me as a TA, some time ago, he redesigned lab exercises that TAs had been doing for ages, and they are now significantly better. He is demanding of his students, but they always rank him at the top of our graduate student teachers.

(*Id.*) Williams' own cover letter expresses much enthusiasm for teaching, stating that:

> I understand that the position at Queens College requires a heavy teaching load. I look forward to such a challenge. My teaching record has been intensively built-up over the past nine years. The high ranks on my student evaluations propel me to seek teaching as a profession. My enthusiasm for teaching appears again and again on literally hundreds of student evaluations. I am comfortable in the classroom and motivate students to excel.

(*Id.*)

The evidence regarding Charles Hilton is somewhat less straightforward, because

the assessment of Hilton's teaching performance that Defendant's search committee members state they relied upon in finding him to have adequately demonstrated his teaching ability was apparently not included in the file for his application. (Welch Depo. at 183.) Professor Welch testified that "by the time the search committee met in December ... one of our faculty members would have observed Professor Hilton in the classroom teaching one of his courses at Queens College.... [T]hat teaching evaluation would have been done by one of our faculty members, and there would have been a report on file in the department." (Welch. Depo. at 171.) Professor Stinson stated during depositions that she observed Hilton teaching, and that she had prepared an evaluation of his teaching. (Stinson Depo. at 84.)

The Court finds that the committee's decision that Hilton had provided adequate evidence of quality teaching performance despite the absence of a physical copy of the evaluation in his file does not evidence inconsistent application of hiring criteria, because Hilton was not similarly situated to Plaintiff or other applicants in terms of Defendant's knowledge of his teaching quality: Hilton was teaching at the same school he was applying to, in a department apparently consisting of only thirteen members (Pl.Ex. 14), and a member of the search committee had actually observed and evaluated his teaching. (Stinson Depo. at 84.)

In summary, therefore, Plaintiff's application is distinguished from those of the applicants who were interviewed by the fact that he was the only applicant who had not been observed by a member of the search committee and had submitted neither teaching evaluations nor letters of recommendation containing substantial positive references to his teaching abilities. His cover letter to his application also devoted less attention to his enthusiasm

for teaching. This Court finds that Defendant's application of the stated hiring criteria was not inconsistent and that there is substantial evidence that Defendant reasonably considered Plaintiff less qualified for the job under this criterion.

### Research and Publications Focusing on Fossil Hominids With The Skeleton as The Source Of Data

Plaintiff asserts that his work focuses on hominids. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 7–8; Peratis Decl. Ex's. 2, 3.) Defendant contends that the search committee reasonably concluded that his work did not focus on hominids, and that his work on gorillas did not match the department's need for a candidate whose research focused on hominids. (Def.'s Mem. Law Supp. Mot. Summ. J. at 26–27; Def.'s R. 56.1 Stmt. ¶ 48.)

The parties are in dispute as to whether Defendant may reasonably have been utilizing a definition of hominids that excluded great apes (orangutans, chimpanzees, and gorillas). Defendant has asserted that they defined hominids as humans and their ancestors, but not great apes, and classified great apes as hominoids. (Def.'s Repl. Mem. Law Further Supp. Mot. Summ. J. at 11; Stinson Decl. ¶ 18; Lee Repl. Decl. Ex. C at 107.) Plaintiff has previously asserted that presently and at the time of Plaintiff's application, the term hominids was considered to encompass humans and the great apes. (Pl. Aff. Opp'n Mot. Dismiss at 3.) Plaintiff has not re-stated this argument in his filings for the present motion, although he does continue to claim that his research evinces a focus on hominids. (See Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 7–8; Peratis Decl. Ex. 1; Pl. R. 56.1 Stmt. at 12)

Defendant has submitted an excerpt from a recently published biological anthropology textbook that describes the "considerable controversy" regarding the

classification of hominids and hominoids. (Stinson Repl. Decl. Ex. B.) It states that "[o]ne possible solution" is to define hominids as consisting of humans and all great apes, but that this "is only one of many proposals[.]" (*Id.*) This textbook indicates that Defendant may have reasonably been utilizing a definition of hominids that excludes great apes, and this Court is not in a position to second-guess Defendant's definition. Since Plaintiff has done little to demonstrate that Defendant could not have reasonably been relying on this definition of hominids, has not renewed his arguments regarding the definition of hominids, and has acknowledged that Defendant may have been relying on the "classic" definition (Pl. Aff. Opp'n Mot. Dismiss at 3) this Court finds no reason to doubt Defendant's assertions that their search committee relied on this definition.

Under this definition of hominids, which excludes great apes, Plaintiff's work still demonstrates some research attention to hominids, but it is evident that most of Plaintiff's work addresses non-hominids, and that the emphasis on hominids is far less clear in Plaintiff's application than in the applications of those candidates who were offered interviews. Plaintiff's cover letter to his application describes his research as "center[ing]" on humans and great apes, and goes on to discuss his work on orangutans, chimpanzees, gorillas, and humans—in other words, in Plaintiff's own description of his work, he summarized it as split between hominids (humans) and non-hominids (great apes), or as split between one hominid species (human) and three non-hominid species (orangutans, chimpanzees, and gorillas). (Stinson Decl. Ex. I.)

Plaintiff contends that one of his letters of recommendation, from Leslie Marcus, states "that he focuses on hominids." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 7.) In fact, however, the second para-graph of the letter begins by saying that Plaintiff's work addresses "not only . . . primates, but . . . other vertebrates as well." (Stinson Decl. Ex. I.) It then goes on to discuss his work on fossil goats (*id.*), which are not hominids. In the fifth paragraph, Marcus states that Plaintiff has been doing work on apes and fossil hominids. (*Id.*) Hominids are the last research topic mentioned by Marcus in the letter and are discussed alongside non-hominids such as non-primate vertebrates and fossil goats. The letter does not at any point state explicitly that Plaintiff focuses on hominids. His letter of recommendation from Rose describes Plaintiff's research as focusing on both hominoids and hominids. (*Id.*) The letter from Butynski describes Plaintiff's work as focusing on gorillas and apes, with the most attention in the letter given to discussion of Plaintiff's work on gorillas, which under Defendant's definition are non-hominids. (*Id.*)

Plaintiff's CV also makes clear that a substantial amount of his work involves nonhominids. Out of 27 publications listed in the CV, one of the publications is about golden moles, four have the term "hominoid" or "hominoidea" in the title with no other species group mentioned, and at least thirteen appear to focus on orangutans, gorillas, or baboons.

Plaintiff points out that Tobias and Henneberg have stated that his work focuses on hominids. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 7–8.) However, the question is not whether Plaintiff's work can be said, in retrospect, to have focused on hominids, but rather whether this focus was apparent to Defendant at the time of the hiring. *See Anderson,* 297 F.Supp.2d at 628; *Taylor,* 1999 WL 124456, at *10. The statements made by Tobias and Henneberg were made during the course of this litigation, not in the materials submitted by Plaintiff at the time he applied for

the job. (*See* Peratis Decl. Ex's. 2, 3.)[6] If Defendant reasonably believed, based on the materials submitted by Plaintiff in his job application, that Plaintiff's work did not focus on the specialty they sought, and based their hiring decision on this objective and race-neutral criterion, their decision is not actionable under Title VII, even if it is later determined that their assessment of Plaintiff's work was inaccurate. *See, e.g., Gilman,* 865 F.Supp. at 193.

The materials submitted by other applicants evince far more clearly their focus on hominids. Although Plaintiff contends that Professor Plummer "had *no* hominid focus/expertise" (Pl.'s Mem. Law Opp'n Mot. Summ. J. at 8), Plummer's cover letter begins by stating "My teaching, fieldwork and laboratory research focus on Pliocene and Pleistocene *hominid* ecology, evolution, and behavior." (Stinson Decl. Ex. L (emphasis added).) The letter goes on to discuss four research topics which Plummer describes as his current focus: fieldwork investigation in Kenya regarding Oldowan hominids, fieldwork in Tanzania regarding Oldowan hominids, reconstruction of social and foraging behavior of Plio–Pleistocene hominids, and analysis of hominid finds. (*Id.*) In other words, he describes four main foci in his work, all of which center on hominids. The three and a half page letter does not contain a single mention of non-hominid species, except for one instance in which Plummer discusses his use of chimpanzee data to reconstruct aspects of hominid behavior. (*Id.*) It is evident from Plummer's CV that most of his publications focus on hominids. (*Id.*) The courses he mentions in the note accompanying his teaching evaluations all focus on hominids. (*Id.*)

Similarly, Charles Hilton's cover letter begins, "My biological anthropology background includes specific training in human skeletal biology, hominid paleontology, human paleobiology, and hominid anatomy/functional morphology, as well as general training in evolutionary theory and primate behavior and evolution. My area of specialization is hominid paleontology[.]" (Stinson Decl. Ex. K.) The letter then goes on to discuss his research, all of which is on hominids (e.g., "My ongoing research interests lie in understanding fossil hominid behavior"). (*Id.*) From his CV, it is evident that his dissertation was on hominids, and his presentations and publications are all about hominids. (*Id.*) Nowhere in his application is a single non-hominid species mentioned. (*Id.*)

David Strait's cover letter begins, "My research interests include the evolutionary history of early hominids" and goes on to say that "Most of my research interests are related to early hominid phylogeny." (Stinson Decl. Ex. M.) His dissertation was on hominids. (*Id.*) It is also clear from his CV that his publications and presentations focus almost exclusively, or perhaps exclusively, on hominids. (*Id.*) His application does not appear to discuss any non-hominid species at any point. (*Id.*)

Finally, Frank L'Engle Williams' cover letter and CV make clear that his research focuses almost exclusively on Neanderthals. The Court assumes that Neanderthals are hominids, as the members of the search committee have implied; Plaintiff

---

**6.** Defendant contends that the declarations submitted by Professors Tobias and Henneberg should not be considered by the Court because Plaintiff failed to comply with Federal Rule of Civil Procedure 26 in submitting these declarations. However, the Court finds that it is unnecessary to rule on this issue because the declarations of Tobias and Henneberg are in any case irrelevant due to Title VII's emphasis on the information available to the decision-makers at the time the hiring decision was made, rather than information that supports a different decision in hindsight. *See Anderson,* 297 F.Supp.2d at 628; *Taylor,* 1999 WL 124456, at *10.

has not asserted any argument to the contrary. (*See* Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J.; Pl. Aff.; Pl. R. 56.1 Stmt.)

In summary, Plaintiff's application is distinguished from those of the other applicants who were granted interviews in that Plaintiff's CV and cover letter suggest that his primary focus, or at least a very substantial portion of his research, is on gorillas and other non-hominid species, while the other applicants' research focused almost exclusively on hominids. This Court finds that Defendant's application of the stated hiring criteria was not inconsistent and that there is substantial evidence that Defendant reasonably considered Plaintiff less qualified for the job under this criterion.

### Breadth of Teaching Experience

Defendant contends that the search committee sought evidence of breath of teaching as demonstrated by having taught at least five different courses. (Def.'s Mem. Law Supp. Mot. Summ. J. at 9.) In the internal hiring memorandum summarizing the applicants' qualifications, the entry for Plaintiff for this criterion stated that no information was available. (Stinson Decl. Ex. H.) It appears that this could have been due to the fact that Plaintiff only listed four courses under the heading "physical anthropology" and the search committee lacked information on whether the remainder of the courses, listed under "anatomy" and "biology" were sufficiently relevant that they should be considered as evidence of breadth of teaching experience in anthropology. However, in light of the members of the search committee's subsequent concessions that this notation may have been a mistake (Gursky Depo. at 137; Welch Depo. at 132), this Court will conclude that Defendant erred in assessing Plaintiff's qualifications in this respect.

### External Grants

Plaintiff's CV submitted for the 2000 position did not list any external grants that he had obtained. (Stinson Decl. Ex. I.) His letters of recommendation do not mention any grants. (*Id.*) In sharp contrast, Plummer's CV lists thirty-four grants he had previously received, and one pending grant, with information for many of them about the amount of money awarded, fully supporting Defendant's description of Plummer as "a star rainmaker." (Stinson Decl. Ex. L; Def.'s Mem. Law Supp. Mot. Summ. J. at 26.) Hilton's application listed one grant that was in preparation and six other grants previously received (Stinson Decl. Ex. K.) Hilton's letter of recommendation from Jeffrey Long states that "[h]e was very persistent in seeking the funds for his doctoral dissertation research. Thereby, he was able to piece together modest contributions from a variety of sources." (*Id.*) David Strait's CV lists two grants that he received, and his letter of recommendation from Bernard Wood states that he:

> played a major role in the preparation of applications we made to the NSF IGERT program. The formal application ran to 80 pages, and David made significant intellectual contributions to the application, as well as providing indispensable practical help in assembling such a large and complex application. He writes cogently, and he has all the skills necessary for securing outside funding.

(Stinson Decl. Ex. M.) Strait's letter from Frederick Grine states that Strait "devised and executed an elegant dissertation, for which he has received NSF funding. Indeed . . . the Director of the Physical Anthropology Program at NSF telephoned me to pass on his congratulations for the most outstanding and glowing reviews of a dissertation improvement application that

he had seen during his tenure in that position." (*Id.*) Williams' CV lists seven grants he had received, as well as four fellowships. (Stinson Decl. Ex. N.) His letter of recommendation from Laurie Godfrey also devotes some attention to Williams' success in obtaining grants. (*Id.*) His letter of recommendation from H. Martin Wobst states that "His doctoral research received the financial support from a number of well-placed funding sources, including Fulbright, Belgian and Dutch national science foundations, and other grants." (*Id.*)

Plaintiff asserts that Defendant could have determined that he obtained external grants by reading the acknowledgments sections of some of his articles, which reference outside grants. (Pl. Aff. at 4.) Plaintiff also suggests that Defendant should have known that he had obtained other grants because it would be unreasonable to assume that anyone with his work experience had not obtained outside grants. (Pl. Aff. at 5.) Plaintiff further argues that Defendant could have contacted him if they wished to know more about his grants. (Pl. Aff. at 4.)

However, in all these respects Plaintiff is not requesting that he be treated similarly to other candidates, but rather that he be treated preferentially, since none of the other candidates relied on Defendant to investigate their funding sources by reading through their publications, or to reach out to candidates for more information, or to make assumptions in their favor based on their work experience. Rather, they simply listed their grants in their CVs, thereby making the information readily available to Defendant's decision-makers.

In sum, Plaintiff's application stands out from those of the candidates who were interviewed in that Plaintiff's is the only one in which grants were not listed on the CV. Despite Plaintiff's allegations that it is

customary not to list grants on a CV, all other candidates did so. Additionally, all but one of the candidates who were interviewed had letters of recommendation that described their ability to obtain grants, and the one candidate who did not have a letter of recommendation to that effect listed 34 grants on his CV. It is clear that the information on ability to obtain grants was much more readily available to Defendant in the applications in which it was clearly stated, as compared to Plaintiff's application. This Court finds that Defendant's application of the stated hiring criteria was not inconsistent and that there is substantial evidence that Defendant reasonably considered Plaintiff less qualified for the job under this criterion.

### Other Factors Considered

 Plaintiff has presented evidence that Defendant's decision-makers considered factors beyond the four official criteria above, and Defendant's decision-makers have agreed as well that this is so. (E.g. Gursky Depo. at 52–53) ("[Y]ou get a large group of people that [are] all qualified to fill your position ... and the question is: Which one of these people will be the best fit in your department? Who is going to be collegial? Who are you going to be able to get along with and ... have a cup of coffee with? These are questions that faculty ask, not just in terms of their academic credentials. That plays a role but often there's more than one person with good academic credentials. You want someone who's going to be a good colleague.") Specifically, Plaintiff alleges that Defendant's decision-makers shared and relied upon rumors about Plaintiff, such as stories that Plaintiff illegally broke a car out of an impound lot, had his wages garnished at a previous academic teaching position, and made an unscheduled and unapproved presentation at an anthropolo-

gy conference. (Stinson Depo. at 57–62; Welch Depo. at 155–56.)

There is some evidence that some of these rumors were based in part in fact. (*E.g.* Pl. Depo. at 159, 166 (stating that "there was no car impounded" but then admitting that there was an incident with an impounded *truck,* in which Plaintiff took responsibility for the breaking of a truck out of an impound lot); Pl. Depo. at 155–60 (admitting that his wages had been garnished at the University of Nevada to pay for library fines, phone bills, and somebody's parking fine).) In any case, however, the actual truth of the rumors is irrelevant if Defendant's decision-makers believed them at the time they made the decision, *see e.g., Gilman,* 865 F.Supp. at 193 (erroneous decision by employer is not actionable under Title VII if it is non-discriminatory), and Title VII clearly does not impose any obligation on Defendant to investigate the truth of the rumors.

More important to this case is the fact that the spreading of rumors about a candidate and subsequent decision not to hire the candidate on the basis of such rumors do not indicate a violation of Title VII unless they are somehow linked to membership in a protected class, because Title VII does not protect citizens against unprofessional or even malicious behavior, but only against discrimination.[7] *Bickerstaff,* 196 F.3d at 452 ("Title VII is not a 'general civility code.' "); *Taylor v. Potter,* 2004 WL 1811423, at *16 (S.D.N.Y.2004) ("While inappropriate . . . derogatory comments (or being 'very very mean') made without distinction to employees' race are not actionable under Title VII."); *Graziano v. N.Y. State Police,* 198 F.Supp.2d 570, 578 (S.D.N.Y.2002) (noting that the plaintiff "may . . . have been the unfortunate target of a conspiracy of his fellow employees who didn't like him" but that "however malicious or contemptible such conduct might be, if it was not [discriminatory], it would not give rise to an action against their employer under Title VII"); *Williams v. NYC Dep't of Sanitation,* 2001 WL 1154627, at *15 (S.D.N.Y. Sept. 28, 2001) ("Of course, 'unfair' treatment or personal animosity is not actionable, only discriminatory treatment is."); *Lenhoff v. Getty,* 2000 WL 977900, at *6 (S.D.N.Y. July 17, 2000) ("even if [defendant's] decision to fire [plaintiff] was petty, mean or wrong, that does not make it illegal") (internal citations and alterations removed); *Gibson v. Brown,* 1999 WL 1129052, at *12 (E.D.N.Y. Oct. 19, 1999) ("Personal animosity is not the equivalent of . . . discrimination and is not proscribed by Title VII.") (internal citations and quotations omitted).

The present case appears to "present[ ] nothing more than a case of personal animosity among people who happen to be of different races, which is not a violation of the various civil rights statutes." *Jones v. Yonkers Public Schools,* 326 F.Supp.2d 536, 546 (S.D.N.Y.2004). Plaintiff's attempts to frame the rumors as "classic anti-Hispanic stereotyping" (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 4), a "racist caricature," and a way of presenting Plaintiff as "a stereotypically hot-headed Hispanic" (*id.* at 22) fail because there is simply no evidence that Defendant's decision-makers, or anyone else, consider spontaneous presentations at conferences,

---

7. The Court does not mean to suggest that consideration of factors such as collegiality and compliance with rules of professional comportment is in fact unprofessional or malicious, and Title VII clearly does not obligate employers to ignore such characteristics in job applicants. The Court simply notes that even if Defendant's decision-makers did indulge in personal animosity as compared to reasonable consideration of the information they had about Plaintiff's personality, it would not be actionable under Title VII unless linked to Plaintiff's race or ethnicity.

breaking cars out of impound lots, failure to pay library fines, or any of the other activities described in the rumors, to be linked to Hispanic ethnicity. These rumors do not appear in any way to be "racist" (*id.* at 22)—rather, they are simply rumors.

Plaintiff has also presented evidence that at least one of Defendant's employees, Sarah Stinson, was already determined not to hire Plaintiff even before reviewing his application, as indicated by the fact that she reportedly stated "we're going to get sued" upon receiving his application. (Gursky Depo. at 57.) Given the fact that Stinson was already familiar with Plaintiff and had rejected his application the previous year, it is highly plausible that Stinson believed, before needing to review his application, that he would not meet the qualifications for the job. Stinson may also have been determined not to hire Plaintiff based on the rumors she had heard about Plaintiff (Stinson Depo. at 45–46), or based on her personal negative impressions of Plaintiff stemming from the phone call that both parties recall (Stinson Depo. at 46), neither of which are actionable under Title VII as explained above. *E.g., Jones,* 326 F.Supp.2d at 546. This Court finds that Stinson's statement is adequately explained by race-neutral motivations.

### Stage Three: Pretext

■ Plaintiff concedes that "[h]ere, the record supports only two explanations: that discrimination motivated Defendant, or that Defendant deemed Plaintiff less qualified than other candidates." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 16.) Given the overwhelming evidence above that Defendant deemed Plaintiff less qualified than the other candidates, there is no support for the alternative contention, that discrimination motivated Defendant.

Plaintiff has argued, however, that Defendant's stated bases for their decision-making were merely pretextual. Plaintiff states that "As to the 2000 job, search committee members admitted in their deposition testimony that many of Defendant's criticisms of Plaintiff's qualifications were false." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 19.) Specifically, Plaintiff points to the statements that: Plaintiff had not taught at least five courses; Plaintiff had not obtained at least one outside grant; Plaintiff had not shown evidence of teaching performance; and Plaintiff had not demonstrated that his research and publications focus on hominids. (*Id.*) Plaintiff asserts that these asserted misstatements "were so blatant and frequent that, a jury easily can conclude, the only logical explanation is that they were intentional pretexts." (*Id.*)

The arguments regarding outside grants, evidence of teaching performance, and research focus on hominids are dealt with above, and for purposes of the pretext discussion, it is sufficient to note that, as discussed above, Defendant provided substantial evidence that Plaintiff was less qualified than the other candidates in these respects, or at the very least distinguished himself from other candidates by placing a burden on Defendant to investigate his qualifications instead of making them apparent in his application materials.

The Court finds that Plaintiff's description of the search committee members as having admitted the falsehood of their prior criticisms of Plaintiff's qualifications (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 6, 19 (claiming that when "[c]onfronted with clear evidence that Sarmiento satisfied [the] four criteria, search committee members admitted in their depositions that he satisfied three" and that "search committee members admitted in their deposition testimony that many of Defendant's criticisms of Plaintiff's qualifications were false")) is misleading. Plaintiff coun-

sel repeatedly attempted to induce members of the search committee to admit that their previous assertions were mistaken, but had little success. For example, Plaintiff counsel asked Professor Gursky, "So you agree that 'no' in the column 'Has obtained at least one outside grant' is a mistake." (Gursky Depo. at 140.) Gursky answered, "Yes. But not as evidenced by his CV." (*Id.*) Gursky then apparently attempted to explain further, saying "I'd like to point out that every CV ..." but was cut off by Plaintiff counsel, who stated "There's no—Dr. Gursky, there is no pending question." (*Id.*) Professor Stinson similarly stated, when shown a paper in which Plaintiff acknowledged a grant and asked whether that suggested that he had received a grant, answered "It suggests it, yes. But it doesn't ..." (Stinson Depo. at 76.) She was then cut off by Plaintiff counsel. (*Id.*)

These individuals were evidently making the logical—and quite appropriate for the purposes of Title VII, *see Gilman,* 865 F.Supp. at 193—distinction between an assessment that can be deemed erroneous based on information available to decision-makers at the time of the application, and one that can only be deemed erroneous in hindsight, using information made available subsequently to the decision during the course of litigation. Defendant's initial assessment, based on the reasonable decision to obtain information grants from applicants' CVs, was not "mistaken" in any way that is meaningful under Title VII. Additionally, as the members of the search committee were attempting to point out, the evidence provided did not conclusively demonstrate that Plaintiff had personally applied for and received grants. (*See, e.g.,* Welch Depo. at 127–28 (pointing out that "support" could refer to access to collections or use of a vehicle rather than a grant).)

The only mistake that the decision-makers have in fact conceded is in regards to the question of whether Plaintiff submitted evidence of having taught at least five different courses, as discussed above. (Gursky Depo. at 137; Welch Depo. at 132.) The members of the search committee did not, as Plaintiff contends, admit that Plaintiff satisfied three of the four criteria. (*See also* Gursky Depo. at 33; Welch Depo. at 123, 126—28, 147.) However, the Court finds that this arguably mistaken assessment of Plaintiff's teaching experience—particularly in light of the possibility that Defendant was not, in fact, mistaken but rather reasonably concluded that there was insufficient information available to make the assessment, as discussed above—is insufficient to raise a material issue of fact regarding pretext, in light of the overwhelming evidence that Defendant did not grant Plaintiff an interview for the reasons stated by Defendant.

Plaintiff additionally argues that he is more qualified than the individuals hired, which Plaintiff asserts is evidence of pretext. (*Id.* at 20.) However, this Court has found, as discussed above, that there is substantial evidence demonstrating that Plaintiff did not meet Defendant's job criteria to the same degree as other applicants, or at least did not make his qualifications as clearly apparent to Defendant as the other applicants. Defendant clearly had a legitimate, non-pretextual basis for finding that Plaintiff was less qualified for the positions. Defendant's decision-makers also had a reasonable, race-neutral belief that the other applicants would be more collegial and a better match for their work environment. There is no evidence of pretext.

### Conclusion

Defendant offered legitimate, non-racial, non-pretextual bases for their decision, namely that the candidates who were se-

lected for interviews were more qualified than Plaintiff. These claims were supported by substantial evidence conclusively demonstrating that the candidates who were interviewed met the criteria sought by Defendant to a considerably greater degree than Plaintiff. Even if Defendant was mistaken in the assessment of Plaintiff's qualifications with regard to the criteria of breadth of teaching performance, Plaintiff failed to prove that their stated bases for the decision were pretextual or that discrimination was even one factor motivating Defendant's decision-makers. Since Plaintiff has "provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext," summary judgment is appropriate with respect to Plaintiff's claims regarding the 2000 Position. *Hoyt,* 309 F.Supp.2d at 307; *Zimmermann,* 251 F.3d at 382; *Meiri,* 759 F.2d at 997.

### Retaliation Claims

To make out a *prima facie* case of retaliation violating Title VII, Plaintiff must show that: (a) he engaged in a protected activity, (b) the employer was aware of that activity, (c) the employee suffered an adverse employment action, and (d) a causal connection existed between the protected activity and the adverse employment action. *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590 (2d Cir.1988) (citing *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111 (2d Cir.1987)).

Plaintiff's EEOC charge against Defendant in this case was not filed until June 12, 2000 (Am.Compl.¶ 6), after the challenged hiring decisions had already been made.[8] It is therefore impossible that a causal connection could be shown between Defendant's hiring decisions and this lawsuit. Plaintiff argues, however, that Defendant retaliated against him for

his previous claims against other academic institutions. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 23–24.)

This Court finds that the evidence that Defendant's hiring decision may have been guided by some belief that Plaintiff has a tendency to file discrimination complaints (Welch Depo. at 157–58) is minute and of minimal possible significance compared to the overwhelming evidence that their decision was guided by race-neutral considerations. The only evidence that the search committee considered Plaintiff's history of discrimination litigation as a factor when deciding whether to interview him is a few ambiguous comments made by search committee members during depositions.

When asked whether the information regarding Plaintiff's litigation history "was presented as a negative behavior incident," Professor Welch stated that "it would be negative if the suit were unjustified. Now given that we had no additional information about the context or that particular situation about the context or that particular situation, I had no way of knowing whether the suit was justified or not or what the outcome of the suit was." (Welch Depo. at 158.) He then responded to the question "I take it that this ... was not a positive recommendation for Mr. Sarmiento?" with the answer "It was not a positive recommendation." (*Id.*) Decision-makers can hardly be called upon to classify a history of litigation as a "positive recommendation," and given Welch's stated caveat that he would only consider the information negative if the suit were frivolous, in addition to the lack of direct evidence that this was even a motivating factor as compared to all the other legitimate factors Welch considered, the Court finds that this does not constitute evidence of retaliatory motive.

---

8. Plaintiff has withdrawn his claim regarding the 2001 hiring decision. (Peratis Decl. ¶ 3.)

Sharon Gursky, after running through all her negative experience with and knowledge of Plaintiff, including Plaintiff's alleged argument with a conference presenter that Gursky witnessed, the rumor that Plaintiff is "a ladies' man," and the rumor that Plaintiff "sues universities regularly," concluded by saying that this was all of her "previous knowledge" regarding Plaintiff. (Gursky Depo. at 46—52.) When then asked what part "this previous knowledge" played in her consideration of Plaintiff's application for the 2000 Position, she answered that it played "a tremendous role." (*Id.* at 52.) Plaintiff misrepresents that comment regarding "a tremendous role" as referencing the information that Plaintiff sues universities regularly (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 4 (stating that "[Stinson] told Prof. Gursky that Sarmiento 'sues universities regularly'; Gursky said that this "played a *tremendous role*" in her negative consideration of his application").) It is apparent simply from the text of the deposition, however, that Gursky was referencing "this previous knowledge" more generally. Moreover, when permitted to elaborate on her comment she spoke about the need to find collegial individuals who are easy to get along with in the workplace and "have a cup of coffee" with, and said nothing about litigation. (*Id.* at 52—53.) She also commented that she did not even know whether the information on Plaintiff's litigation history was true. (*Id.* at 52.) This Court finds that there is insufficient evidence to suggest the required causal connection between the protected activity and Defendant's hiring decision, as required to establish a *prima facie* case. *See Manoharan,* 842 F.2d 590.

## CONCLUSION

For the reasons discussed herein, this Court finds that even assuming, *arguendo,* that plaintiff has established a *prima facie* case of discrimination in regards to the 1999 and 2000 hiring decisions, Defendant has offered substantial evidence of legitimate, nondiscriminatory bases for their decision, satisfying part two of the burden-shifting test, and that plaintiff failed to provide sufficient evidence of pretext. Plaintiff has not demonstrated that discrimination was even one motivating factor underlying Defendant's decisions. *See Penta v. Sears Roebuck Co.,* 2003 WL 21143071, at *7 (E.D.N.Y. May 12, 2003); *Reeves,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105. *Manoharan,* 842 F.2d 590. The Court also finds that Plaintiff has not established a *prima facie* case of retaliation. Defendant's Motion for Summary Judgment is therefore GRANTED in its entirety, and the Clerk of the Court is directed to close the case.

SO ORDERED.